## CORPORATION COURT OF THE CITY OF WINCHESTER

Shelton S. Price et al.

v.

Thomas G. Scully et al.

January 9, 1959

BY JUDGE JOHN D. BUTZNER, JR.

This suit seeks to impress upon a piece of land, called for convenience the Amherst Street Tract, an oral negative servitude, or equitable easement, restricting the use of the tract to residential or park purposes. The complainants are owners of some of the lots in subdivisions known as Academy Heights and Academy Heights Addition. They ask that the defendant, Thomas G. Scully, owner of the Amherst Street Tract, and his successors in title be enjoined permanently from establishing any commercial enterprise on the tract. The evidence was heard *ore tenus*, and the court viewed the properties involved. The pertinent facts can be stated briefly.

In 1940 the defendant acquired 12.4 acres of land in Winchester. He subdivided part of this land and called it Academy Heights. The lots were restricted to residential use. No written restrictions were placed on that part of the land which was not subdivided.

In 1954 Scully and James R. Wilkins acquired 6.39 acres adjoining Scully's property mentioned above. Part of this land was subdivided as Academy Heights Addition. The lots were also restricted to residential use, but the part of the property which was not subdivided was not restricted by any writing.

The parts of the two properties which were not subdivided constitute the Amherst Street Tract. It is unplatted and undeveloped. It is roughly a rectangle containing about three acres, fronting 580 feet on Amherst Street, which is also

Route 50. Its depth is between 275 and 300 feet. On the north it is bounded by Amherst Street, Route 50; on the east, by commercial property of Williams; on the south, by Academy Heights Addition; and on the west, by undeveloped property of the Glass Estate. Scully owned the western one-third of the Amherst Street Tract, and he and Wilkins owned the eastern two-thirds. Scully acquired Wilkins' interest in the tract in 1957 and 1958.

The complainants acquired their lots in 1955 and 1956. They base their cause of action upon statements alleged to have been made to them before they purchased their lots either by Scully, or by Wilkins as partner or co-adventurer with Scully, or by Hoye L. Riley or Merton W. Brown as agents of Scully.

Since these statements are the basis of the plaintiffs' claim, they will be set forth in some detail.

Shelton S. Price, a plaintiff, testified Scully said to him: " 'Now, if you buy a lot on the west side over here, you will never have any building or anything behind you there, because that's owned by the Glass interests, or Glass Estate, wealthy people.' I never heard of them before. Now, he said 'all down in here to Route 50,' or Amherst Street as I found out, 'why, that's all zoned residential and will always be residential'." (T. 24, 25.)

A number of witnesses testified that they talked with Wilkins, as follows.

Lackey G. Semples: "And I asked Mr. Wilkins at that time and he advised me that the land was zoned residential and in just so many words, I don't know, but he conveyed the message to me, the way I received it, that it would remain residential, that there was nothing to worry about like that … . (T. 7.)

Semples also testified that he "assumed" Wilkins meant all of the Amherst Street Tract. (T. 7, 8.)

Michael D. Papamichael: "I asked Mr. Wilkins what was going to happen — I asked him if the lots in the back were part — were subdivided, part of the subdivided, and he said no. I asked him what was going to happen to those lots, and he said they were going to be residential … ." (T. 18.)

Helen Ritter Edmonds: "he [Wilkins] complimented us on the choice of our lot, and he said, 'This is a lovely view and there may be' — I don't know how he said it, but he gave me the impression … that there would be a park below us." (T. 75.)

Robert S. Kern: "He [Wilkins] said their plans were uncertain about that but that it would be residential and we had nothing to worry about." (T. 79.)

Kern also testified that Wilkins spoke of donating part of the tract to the city as a park, discussed how a street could be run in, and spoke of planting willow trees along Route 50. (T. 79, 80, 81.)

Charlotte M. Kern, speaking of a part of the tract, testified: "Mr. Wilkins did indicate that there was a possibility this land would be given to the city and possibly used for a park." (T. 86, 87.)

Hoye L. Riley was a real estate agent who showed some of the lots. Several of the witnesses testified to statements he made.

William B. Price: "So I asked Mr. Riley what was the intentions of the owners, Mr. Scully and Mr. Wilkins, with regard to the property along Amherst Street, and he advised me that it was zoned residential and it would always be zoned residential, and that the whole area would be a fine place to build a house as it was in one of the most exclusive sections of Winchester." (T. 37.)

On cross-examination, Price said Riley made the statement that it was the intention of the owners to build houses on the tract, but that he did not remember the agent's exact words. (T. 42, 43.)

John J. Hawes: "He [Riley] told us that the whole area was zoned residential and during the course of our conversation — and I can't remember the specific way that it was phrased — the possibility was mentioned of the area being developed into a park." (T. 61.)

Stuart G. Edmonds, when asked about a conversation with Riley concerning the Amherst Street tract, testified: "Yes, during our conversation up there he told us that we would never have to worry about any commercialization down below because it was zoned residential." (T. 69.)

Helen Ritter Edmonds testified to statements made by Riley pertaining to Amherst Street: "That the property on the west side of Amherst Street was residential, that it was a lovely neighborhood and would remain so. He also mentioned the fact that there would probably be a park down there some day. I don't recall the exact words or who was planning to put the park there, but the park was mentioned … ." (T. 74.)

Merton W. Brown was another real estate agent who showed lots. William D. Bauserman testified Brown spoke of the Amherst Street Tract as follows: "and I asked Mr. Brown at this time about some of the land below us and who owned that, and it was told to me that it was Scully and Wilkins that owned the land, this particular tract. So I asked if the land was zoned residential, and he said it was, and he told me that these were choice building lots and that it was one of the best residential areas in the City of Winchester. So I was interested in purchasing more than one lot … ." (T. 49, 50.)

(The lots to which reference was made were not in the Amherst Street Tract but were in Academy Heights Addition.)

Jeannette Bauserman testified concerning Brown's discussion of the Amherst Street Tract: "Well, he told us it was all zoned … . He said that that

was all residential and we assumed it would be or we wouldn't have built up there." (T. 56.)

Scully denied the statements about the Amherst Street Tract attributed to him by Price. (T. 130.) Wilkins denied that he made statements to the effect that the property would remain residential. (T. 150-56.) Riley admitted saying the property was zoned residential but did not recall stating that it would remain residential. (T. 157-60.)

At the time the above mentioned statements were alleged to have been made, the Amherst Street Tract was zoned residential. Later, however, the Corporation Court of the City of Winchester ordered that Scully be granted a building permit for a food store on the tract because of defects in the zoning ordinance and the character of the tract. (Def. ex. 2.)

The plaintiffs all testified to the effect that they would not have bought their lots and erected their homes if they had known that the Amherst Street Tract could be used for other than residential purposes. However, one of the plaintiffs, Kern, started to erect his home after this suit was brought. (T. 79, 82.)

There is no definite testimony that the plaintiffs will suffer monetary damages if the Amherst Street Tract is used for commercial purposes.

The defendants urge that the plaintiffs are barred by estoppel because they did not insist that the statements made to them be included as restrictive covenants in their deeds and also that the plaintiffs are barred by laches. The doctrine of estoppel is not applicable. There is no evidence that the plaintiffs were under any duty to speak or that by their silence they intentionally misled the defendants to their prejudice. The plaintiffs instituted this suit within a reasonable time after the court held the zoning ordinance invalid. There is no evidence that the defendants were prejudiced by any delay. The court holds, therefore, that the plaintiffs are not barred by estoppel or laches.

Virginia has long approved the doctrine of *Tulk v. Moxhay*, 2 Ph. 774, 41 Eng. Rep. 1143 (Ch. 1848), pertaining to the enforcement of equitable restrictions. *Cheatham v. Taylor*, 148 Va. 26, 138 S.E. 545 (1927); *Springer v. Gaddy*, 172 Va. 533, 5 S.E.2d 355 (1939); *Renn v Whitehurst*, 181 Va. 360, 25 S.E.2d 276 (1943); *Equitable Restrictions in Land and Tulk v. Moxhay in Virginia*, 39 Va. L. Rev. 703 (1953).

Virginia has recognized what may be termed an extension of the doctrine of *Tulk v. Moxhay* to the effect that implied restrictions will be enforced upon proof of a general restrictive building plan or scheme. *Cheatham v. Taylor*, 148 Va. 26, 138 S.E. 545 (1927) (dictum). Conversely, where there is no general plan for the development of the property, even a written restriction will

not be enforced at the suit of one purchaser against another. *Stevenson v. Spivey*, 132 Va. 115, 110 S.E. 367 (1922).

In the case at bar, the evidence showed that Academy Heights and Academy Heights Addition did not form a general restrictive building scheme or plan with the unplatted and undeveloped Amherst Street Tract. For example, Lacky G. Semples, a plaintiff, testified that the Amherst Street Tract was not part of the subdivision and that he knew this when he bought his lot. (T. 15.)

There are marked differences between the subdivisions and the Amherst Street Tract. The subdivisions are on high, rolling ground. The lots, with the exception of the Kern property, are considerably higher than the main portions of the tract. No street connects the subdivisions directly with the tract or Amherst Street (Route 50). The subdivisions do not immediately face the tract. The back of several of the lots, however, adjoin and overlook the tract. With the exception of these lots, the view of the tract is limited and interrupted in varying degrees depending on the exact location of the houses. At the Shelton S. Price property, only glimpses of the tract may be had.

The Amherst Street Tract is a poor location for residential property. The greater part of it is low. It fronts on a busy highway. In its vicinity are commercial and manufacturing establishments. (T. 124, 125, and def. ex. 2.) The situation is similar in some respects to *Renn v. Whitehurst*, 181 Va. 360, 25 S.E.2d 276 (1943), where a part of a property did not lend itself to a restricted residential area and was sold without restrictions.

The court finds that the subdivisions and the tract do not constitute a general restrictive building plan or scheme. Consequently, the restrictions cannot be imposed by implication.

In *Tulk v. Moxhay* and the several Virginia cases that have dealt with the subject, the restrictions have been set forth in deeds in the chain of title. In the case at bar, however, the alleged restrictions were verbal. This raises the question of the statute of frauds and presents an issue that has not been expressly decided in this state. The restrictions have been referred to as equitable easements and equitable servitudes. *Springer v. Gaddy*, 172 Va. 533, 540, 2 S.E.2d 355, 358 (1939). Thus they appear to be property rights, *Meagher v. Appalachian Electric Power Co.*, 195 Va. 138, 77 S.E.2d 461 (1953), and are embraced within § 1-13(12) of the Code of Virginia 1950, which defines real estate. It follows that the restrictions are subject to the statute of frauds, § 11-2(6) of the Code of Virginia, 1950, unless some reason exists for removing them from the operation of the statute.

A majority of the courts that have considered this question have concluded that oral restrictions are within the statute of frauds. *Annotation, Oral*

*agreement restricting use of real property as within statute of frauds*, 5 A.L.R. 2d 1316, 1318. A case that thoroughly discusses the problem is *Cottrell v. Nurnberger*, 131 W. Va. 391, 47 S.E.2d 454, 5 A.L.R. 2d 1298 (1948). The facts in that case are somewhat similar to those in the case at bar, except that the property there involved was all in the same subdivision. The purchasers of lots sought to prevent the sale of a lot in the subdivision for building purposes on the ground that verbal representations had been made to them that the lot would be used for recreational purposes. The court held that the agreement was within the statute of frauds and denied relief.

The complainants cite *Trueheart v. Price*, 16 Va. (2 Munf.) 468 (1811), as authority for imposing the restrictions and granting the injunction. The case is not fully reported. Trueheart conveyed a lot with appurtenances to DuVal. An alley adjoined the lot. Trueheart verbally represented to DuVal that the alley "was established, and to be always kept open." DuVal thereupon built a house opening on the street and behind the house an office opening on the alley. Access to the office from the street could be had only through the house, and at times this was impossible. Trueheart never protested use of the alley while the office was being built. Later DuVal sold the property with appurtenances to Price. Trueheart then sought to close the alley, claiming the agreement was within the statute of frauds. In a suit brought by Price, Trueheart was enjoined. The reason for the decision was not given. Since Price was a remote grantee, the decision probably rested upon the theory that the alley was an appurtenance of the lot passing by the two conveyances that included appurtenances. Or the decision could have rested upon the proposition that, since the representation concerned an existing fact, Trueheart was estopped. The fact that Price was a remote grantee would, however, give some difficulty to the estoppel theory. In any event, the case has not been cited by the Supreme Court of Appeals as authority pro or con in the many cases dealing with restrictive covenants in subdivisions. The case was decided thirty-seven years before *Tulk v. Moxhay* which is generally recognized as establishing the broad doctrine of restrictive covenants. The case was considered by the West Virginia Court in *Cottrell v. Nurnberger*, 131 W. Va. 391, 47 S.E.2d 454, 5 A.L.R. 2d 1298 (1948), as an exception to the application of the statute of frauds. The court believes the *Trueheart* case is not applicable to the facts in the case at bar and that it is not controlling.

The complainants also rely on *Buckles etc. v. Kennedy Coal Corp.*, 134 Va. 1, 114 S.E. 233 (1922). There the court recognized part performance as a ground for enforcing a parol grant of an easement. In that case, the grantee built a railroad over the easement. The work was done on the servient tenement. In the case at bar, the only performance by the complainants related

to their own lots and not to the Amherst Street Tract. Thus, their acts did not refer unequivocally to, or result from, any alleged agreement concerning the Amherst Street Tract. For these reasons, the court holds that the doctrine of part performance affords no ground for avoiding the statute of frauds. *Plunkett v. Bryant,* 101 Va. 814, 45 S.E. 742 (1903).

The complainants also urge that the defendants are estopped to plead the statute of frauds. The same contention was held to be without merit in *Cottrell v. Nurnberger,* 131 W. Va. 391, 47 S.E.2d 454, 5 A.L.R. 2d 1298 (1948). Since the tract was zoned residential at the time the statements were alleged to have been made, the complainants could not have been misled by such statements although the ordinance was later determined to be invalid. If the complainants were misled, it was by the invalidity of the ordinance, not by the statements. Statements to the effect that the property would remain residential cannot be the basis of estoppel. 1 *Minor on Real Property* (Ribble), § 105.8, p. 145. In *Brooks v. Clintsman,* 124 Va. 736, 740, 98 S.E. 742, 743 (1919), the court said:

> the doctrine [equitable estoppel] is not founded upon expectation; ordinarily it rests upon past or present considerations, and not on possible future events based upon opinion as to the supposed intention of another.

*Brooks v. Clintsman, supra,* is also authority for the rule that estoppel must be certain to every intent and is not to be taken by argument or inference. The testimony does not satisfy this strict requirement.

The complainants also contend that the statute of frauds should not apply because of constructive fraud practiced on them by the defendants. In Virginia, fraud must be clearly alleged. *Dobbs v. Dobbs,* 150 Va. 386, 143 S.E. 702 (1928). The complainant, however, did not allege fraud. Fraud is not presumed. It can be proved only by clear, convincing, and cogent evidence. The court holds that fraudulent representations have not been proved by such evidence. Furthermore, the statements upon which the complainants rely fall in two general classifications. First, that the property was zoned residential. Actually, the City Council of Winchester had zoned it residential, but the ordinance was invalid. Representations of the law are not fraudulent. *Hicks v. Wynn,* 137 Va. 186, 119 S.E. 133 (1923). Secondly, that the property would always be residential or be made a park, representations of future prospects are not fraudulent. *Dudley v. Minor,* 100 Va. 728, 42 S.E. 870 (1902). Fraud, therefore, has not been established.

The court believes that the rule that restrictive covenants are within the statute of frauds is sound and should be applied to this case, and therefore, it holds that the statute of frauds constitutes a defense to this suit.

Several other issues were raised, and while the foregoing disposes of the case, it may not be amiss to comment upon them. The court is of the opinion that Scully was not bound by the statements alleged to have been made by Riley and Brown. The complainants proved that these men were agents to sell lots in the subdivision. The proof does not establish that they were authorized to make covenants or create easements or servitudes with reference to the Amherst Street Tract or that any statements made by them were within the scope of their agency.

Nor was Scully bound by any statements alleged to have been made by Wilkins. A co-adventurer is bound only by statements made within the scope of the enterprise. It was proved that Wilkins and Scully were co-adventurers with regard to Academy Heights Addition, but the proof is insufficient to establish that their co-adventure embraced the Amherst Street Tract, which they had not undertaken to develop. Wilkins, moreover, did not own any interest in a part of the tract.

The injunction is denied and the bill dismissed.